# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

---

ALBERT RAY, JR.,

                                            Plaintiff,

        v.                                      3:15-CV-8
                                                    (MAD/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                            Defendant.

---

PETER A. GORTON, ESQ., for Plaintiff
KAREN T. CALLAHAN, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable Mae A. D'Agostino, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I.    PROCEDURAL HISTORY

On March 16, 2012, plaintiff protectively filed[1] an application for Supplemental Security Income ("SSI") Benefits, alleging disability beginning November 20, 2009. (Administrative Transcript ("T.") at 12, 151-59). Plaintiff's claims were denied initially on July 2, 2012. (T. 60-61). Plaintiff testified at a hearing, which was held by

---

[1] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. §§ 404.630, 416.340. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a later date.

video conference on June 12, 2013 before Administrative Law Judge ("ALJ") Marie Greener. (T. 27-52). The ALJ issued a decision denying the applications on August 2, 2013. (T. 9-26). The ALJ's determination became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on December 15, 2014. (T. 1-4).

## II. APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next

2

considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [per se] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012)); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *Selian*, 708 F.3d at 418 & n.2.

**B.     Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Talavera*, 697 F.3d at 151 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It must be "more than a scintilla" of evidence scattered throughout the

administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at \*6 (W.D.N.Y. Dec. 6, 2010).

## III.   FACTS

As of the date of the administrative hearing in June 2013, plaintiff was 40 years old. (T. 31). Plaintiff had completed the ninth grade in regular education classes, and had been held back at least once. (T. 43). He left school at the age of 18 after getting in a dispute with an assistant principal over an unexcused absence. (T. 43). He

subsequently obtained his General Equivalency Degree and some college credits. (T. 369). He was single, and lived alone. (T. 31, 151-52). At the time of his application for benefits, he resided at the YMCA in Binghamton, New York. (T. 154). At the time of his hearing, plaintiff had relocated to a temporary apartment after being evicted from the YMCA for failing a marijuana test, and he was looking for permanent housing. (T. 46, 51, 430, 433).

Plaintiff had a history of alcohol and substance abuse, and he was briefly incarcerated for unauthorized use of a motor vehicle. (T. 371). Plaintiff had a limited work history, with his most recent full time employment as a laborer at a metal scrap yard. (T. 32, 172). He left this employment in 2010 after "getting tired of the way I was being treated." (T. 34). Plaintiff testified that he now spent most of his day playing video games, often for ten or fifteen hours at a time. (T. 41). He generally avoided people, but did visit his mother and regularly went hunting and fishing with a close friend. (T. 41, 46, 242-43). He also went to the library to use the internet, but testified that he had not done so in several months. (T. 49).

Plaintiff had been hospitalized twice for depression and anxiety, in 1995 and 2010. (T. 248-55, 369). When he was admitted in 2010, he expressed concern that he might harm himself or others. (T. 254, 369). He received regular outpatient psychiatric counseling, most recently in December 2012, and was prescribed medication for anxiety and depression by his primary care physician. (T. 339-63, 429-38). During therapy sessions, plaintiff described his problems as depression, a lack of motivation, trouble maintaining concentration, and anxiety around crowds or groups of people that

he did not know. (T. 293, 435-36).

The ALJ's decision provides a detailed statement of the medical and other evidence of record. (T. 14-16, 18-20). Rather than reciting this evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.

## IV.  ALJ's DECISION

At step one of the sequential analysis, the ALJ found that plaintiff had not engaged in substantial gainful activity since the application date of March 16, 2012. (T. 14). Next, the ALJ determined that plaintiff's anxiety disorder, depressive disorder, cognitive disorder, and polysubstance abuse were severe impairments. (T. 14-15). The ALJ concluded that plaintiff's other impairments, including a history of seizures, vitamin B12 deficiency, acid reflux, hernia, headaches, and back pain were not severe. (T. 15). At the third step, the ALJ determined that plaintiff's impairments did not meet or medically equal the criteria of the listed impairments in Appendix 1 to 20 C.F.R. Part 404, Subpart P. (T. 16-17).

The ALJ next concluded that plaintiff retained the RFC to perform a full range of work at all exertional levels, so long as the work consisted of simple repetitive tasks, and plaintiff was not working in close proximity to others. (T. 17-21). While the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms, the ALJ decided that plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were not credible, because they were not supported by his treatment notes or treatment history and were

inconsistent with plaintiff's activities. (T. 20). The ALJ also noted in her credibility determination that plaintiff gave inconsistent statements regarding his drug and alcohol history. (*Id*.).

At step four, the ALJ concluded that plaintiff had no past relevant work. (T. 21). The ALJ thus proceeded to step five and determined that there were jobs that existed in significant numbers in the national economy that plaintiff could perform. (*Id*.) Therefore, the ALJ determined that plaintiff had not been under a disability from the alleged onset date of June 15, 2001 through the date of her decision. (T. 21-22).

## V.   ISSUES IN CONTENTION

Plaintiff makes the following claims:

(1)    The ALJ improperly weighed the medical opinion evidence, and her RFC determination was not supported by substantial evidence. (Pl.'s Br. at 8-21) (Dkt. No. 12).

(2)    The ALJ's step five determination did not properly consider plaintiff's non-exertional limitations, and the ALJ should have obtained the testimony of a vocational expert ("VE"). (Pl.'s Br. at 21-23).

Defendant argues that the Commissioner's decision was supported by substantial evidence. (Def.'s Br. at 5-20) (Dkt. No. 15). As discussed below, this court agrees with the defendant and will recommend dismissal of the complaint.

## VI.   RFC

### A.   Legal Standards

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's

subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Id.* (citing, *inter alia*, *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984)). RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Id.* (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-1120 (DNH/GHL), 2010 WL 3825629, at *6 (N.D.N.Y. Aug. 17, 2010) (citing SSR 96-8p, 1996 WL 374184, at *7).

Although the RFC determination is reserved for the commissioner, the RFC assessment is still a medical determination that must be based on medical evidence of record, and the ALJ may not substitute her own judgment for competent medical opinion. *Walker v. Astrue*, No. 08-CV-828, 2010 WL 2629832, at *6 (W.D.N.Y. June 11, 2010) (citing 20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2)) (Rep't-Rec.), *adopted*, 2010 WL 2629821 (W.D.N.Y. June 28, 2010); *Lewis v. Comm'r of Soc. Sec.*, No. 6:00-CV-1225, 2005 WL 1899399 at *3 (N.D.N.Y. Aug. 2, 2005)). In addition to the plaintiff's own physicians and other medical sources, the ALJ may rely upon a "medical advisor" who is a non-examining state agency "medical consultant" or an examining consultative physician to whom the plaintiff was sent at agency expense. *See Walker v. Astrue*, 2010 WL 2629832 at *6-7.

8

## B. Application

In light of her finding that plaintiff had no severe physical impairments, the ALJ determined that plaintiff had the RFC to perform a full range of work at all exertional levels, but with certain nonexertional limitations. (T. 17). In particular, the ALJ found that plaintiff was limited to performing simple repetitive tasks, and should not work in close proximity to others. (*Id*.). Plaintiff argues that the ALJ did not properly weigh the medical evidence in the record, resulting in an RFC that is not supported by substantial evidence. This court disagrees.

In reaching the RFC determination, the ALJ gave the "greatest weight" to the June 1, 2012 opinion of state reviewing psychologist, Dr. T. Harding, who opined that plaintiff could perform an entry level job with simple repetitive tasks, and would be best able to work in an environment where he was not in close proximity to others. (T. 19, 379-97). Dr. Harding based his conclusions on a review of the available medical records, including the consultative examination performed by Dr. Mary Ann Moore on May 16, 2012. (T.369-74, 396). The ALJ found that Dr. Harding's opinion was generally supported by plaintiff's activities of daily living, plaintiff's treatment history, and the associated treatment notes. (T. 19).

Plaintiff objects generally to the ALJ's reliance upon the state agency consultant's opinion, and argues that the ALJ improperly cherry-picked the medical evidence by ignoring more restrictive limitations found by Dr. Moore. (Pl.'s Br. at 8-18). Plaintiff also argues that the ALJ erred by assigning little weight to the opinions of independent medical examiners Dr. Nathan Hare and Dr. Cheryl Loomis, who

examined plaintiff on behalf of the Broome County Department of Social Services in December 2012 and March 2013, respectively. (Pl.'s Br. at 18-19).

As an initial matter, ["i]t is well-settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability." *House v. Comm'r of Soc. Sec.*, 32 F. Supp. 3d 138, 151-52 (N.D.N.Y. 2012) (citing*, inter alia, Leach ex rel. Murray v. Barnhart*, No. 02 Civ. 3561, 2004 WL 99935, at *9 (S.D.N.Y. Jan. 22, 2004) ("State agency physicians are qualified as experts in the evaluation of medical issues in disability claims. As such, their opinions may constitute substantial evidence if they are consistent with the record as a whole.")). In addition, based upon this court's review of the record, the ALJ's assessment of the opinion of Dr. Harding was supported by substantial evidence.

Plaintiff was hospitalized for depression disorder in December 2010. (T. 249-50). At admission, he reported that he had recently moved into a trailer with some friends, and was unhappy about his living conditions and financial situation. (T. 249). He frequently argued with his friends, and worried that he would harm them, or himself, when angry. (*Id*.). During his psychiatric evaluation, plaintiff reported that he had been previously been hospitalized for an attempted overdose of psychiatric medication in 2005. (T. 251). Plaintiff's discharge report noted that plaintiff had been cooperative and agreeable with other patients and with staff. He was considered stable to return home, with follow-up psychiatric care. (T. 254-55). Plaintiff described himself as "happy and hopeful" at the time of his 2010 discharge. (T. 254).

During follow-up treatment with the Broome County Mental Health Clinic in April 2012, plaintiff reported that he had difficulty being around groups of people, especially strangers. (T. 362-63). Plaintiff's continued housing and financial difficulties were a significant source of frustration, and he expressed the opinion that getting a job would help him. (T. 347, 349). He was prescribed psychiatric medication by the clinic, but took himself off the medication in April 2011. (T. 430). Later, his primary care physician prescribed Zoloft and hydroxyzine, and plaintiff testified at the hearing that he continued to take these medications. (T. 36).

During a visit with his primary care provider in July 2011, plaintiff complained of headaches but otherwise exhibited intact concentration, normal memory, and did not report any anxiety or depression. (T. 264). In August 2011, plaintiff reported that his medication made him fall asleep, but his physician did not identify any concerns with plaintiff's mental health and recommended continued use of the medicine. (T. 266, 270). Plaintiff's most recent visits to a primary care physician, between October and December 2012, involved only physical impairments such as back pain and a vitamin B12 deficiency. The treatment notes from these visits do not raise any concerns regarding plaintiff's mental health. (T. 416-28).

Plaintiff's most recent psychiatric treatment was at the Broome County Mental Health Clinic between May and December 2012. (T. 429-38). Plaintiff's therapist, Licensed Certified Social Worker Kim Saunders, repeatedly challenged plaintiff on the nature of his symptoms and questioned whether therapy was necessary. (T. 430, 434, 437). During these appointments, plaintiff did not identify any mental health concerns

except for general complaints about a "lack of motivation, lack of ambition, and lack of comfort socially with others." (T. 430, 434). Plaintiff reported that he had begun feeling less depressed since he had reconnected with an old friend, with whom he regularly visited and went fishing. (T. 438). When questioned how plaintiff's anxiety prevented him from seeking employment, plaintiff reported that "he gets easily triggered by rude or demanding personalities," and that crowds or similar "quantity of individuals" made him anxious. (T. 436). When Saunders suggested that plaintiff "could work in a job such as grocery store stocking on the 3rd shift, he said 'no.'" (*Id.*). Plaintiff was deemed to have completed treatment and was discharged from the therapy program in December 2012. (T. 431).

Consistent with Dr. Harding's opinion, plaintiff's treatment history demonstrates that he responded well to psychiatric treatment and medication, and that his therapist believed that plaintiff could adequately function absent the stress of being in a crowd or with a significant number of people that plaintiff did not know. (T. 436). Plaintiff's testimony also supports this conclusion. The ALJ cited plaintiff's testimony that he had sufficient concentration to play video games for more than two hours at a time, and was able to hunt and fish with his friend. (T. 20). Based on the consistency with the record, the ALJ had substantial evidence to assign the state consultant's opinion great weight.

Plaintiff contends that the ALJ did not adequately consider Dr. Harding's completion of certain checkboxes in Section I of his assessment form, that indicate "moderate limitations" in such areas as understanding and remembering detailed instructions; performing activities within a schedule; maintaining attention and

12

concentration for extended periods; working in coordination with or proximity to others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically based symptoms; and performing at a consistent pace without an unreasonable number and length of rest periods. (T. 394-95). As defendant points out, the Social Security Administration has stated in its operations manual that these check boxes are summary conclusions that do not constitute the consultant's RFC assessment.[2] There is no indication that Dr. Harding intended to use the check boxes to establish any greater limitations than were described in his narrative conclusions about plaintiff's functional capacity. In his narrative, Dr. Harding included accommodations such as limiting plaintiff to simple repetitive tasks in a work environment that was not in close proximity to others. (T. 396).

Plaintiff also argues that the ALJ should have assigned greater weight to the opinions of consultative examiner Dr. Moore (assigned "some weight"), and independent medical examiners Dr. Hare and Dr. Loomis (each assigned "little weight"). The ALJ reviewed all of these opinions according to their consistency with plaintiff's treatment history and plaintiff's daily activities, so the court will address them together. (T. 19-20).

Dr. Moore opined that plaintiff could follow and understand simple directions and instructions, perform rote tasks under supervision, consistently perform simple tasks, and could learn simplistic and complex tasks. (T. 19, 372-73). She also

---

[2] Program Operation Manual Systems ("POMS") D1 24510.006 is available at https://secure.ssa.gov/poms.nsf/lnx/0424510060.

concluded that plaintiff had difficulty dealing with stress, and could have problems making appropriate work decisions and maintaining a regular work schedule, based upon his history of acting impulsively and exhibiting wide mood swings and aggression towards himself and others. (T. 373).

During the examination, Dr. Moore found that plaintiff was generally cooperative to questioning, but that he had a difficult time monitoring his word use and cursed throughout the evaluation. (T. 371). He appeared coherent and goal oriented, with no evidence of hallucinations, delusions, or paranoia during the examination. (*Id.*). Plaintiff reported that he could dress, bathe, and groom himself; shop for groceries; use public transportation; and was trying to do his own cooking, cleaning, and laundry. (*Id.*). His concentration was intact, but plaintiff appeared hostile or angry toward the world in general. (T. 372).

Dr. Hare evaluated plaintiff on March 7, 2013, after a psychiatric examination. (T. 405-415). Dr. Hare found that plaintiff had "no useful ability to function" in a series of areas, including maintaining attention for a two hour segment, sustaining an ordinary routine without special supervision, performing at a consistent pace without an unreasonable number of psychologically based symptoms, and dealing with normal work stress. (T. 412). Based on these findings, Dr. Hare concluded that plaintiff was not able to do sustained work-related physical or mental activities in a work-like setting on a regular and continuing basis, particularly in light of plaintiff's high level of mood instability and difficulties with anger and temper management and his history of social difficulties. (T. 410).

Dr. Loomis conducted a Psychological Assessment for Determination of Employability on behalf of the Broome County Department of Social Services on May 9, 2013. (T. 439-453). This included administering an IQ test, on which plaintiff obtained a full scale IQ of 79, placing him in the borderline range of intellectual functioning. (T. 443). Dr. Loomis found a relative weakness in plaintiff's processing speed ability that impacted his ability to maintain attention, and a relative strength in plaintiff's perceptual reasoning ability that supported plaintiff's verbal reasoning. (T. 443). Dr. Loomis noted that plaintiff's overall test scores placed him at the equivalent to twelfth grade, which was higher than his full scale IQ would indicate. (*Id*.).

Dr. Loomis opined that plaintiff had no limitations in his ability to maintain basic standards of hygiene and grooming and could use public transportation. She further opined that plaintiff had moderate limitations (unable to function 50% of the time) in several areas: the ability to maintain attention and concentration for rote tasks; the ability to attend to a routine and maintain a schedule; the ability to handle low stress and simple tasks; and the ability to follow, understand and remember simple instructions and directions. (T. 20, 444). Dr. Loomis also found that plaintiff was very limited (unable to function 75% or more of the time) in his ability to perform complex tasks independently. (T. 444). Based on these findings, Dr. Loomis opined that plaintiff was permanently disabled, was not expected to improve, and was unable to participate in any activities such as work, education, or training. (T. 445).

The primary difference between the opinions of Dr. Moore and Dr. Harding (assigned "greatest weight") was the consultative examiner's conclusion that plaintiff's

mental impairments could cause difficulties in making appropriate work decisions and maintaining a regular work schedule. (T. 373). The ALJ did not find any support for this conclusion in Dr. Moore's consultative examination report, plaintiff's treatment notes, or plaintiff's own description about his inability to work, and thus discounted the opinion by assigning it only "some weight." (T. 19).

The ALJ assigned the opinions of Dr. Hare and Dr. Loomis "little weight" because they were based upon a single examination, and their conclusions were not supported by plaintiff's treatment history or plaintiff's testimony regarding his own activities. (T. 20). The court notes that neither Dr. Hare or Dr. Loomis had an opportunity to review plaintiff's prior medical records, and relied on plaintiff for a description of his psychiatric history. (T. 407, 441).

In assigning reduced weight to these three opinions, the ALJ noted the numerous records that contradicted their findings of more restrictive limitations, including plaintiff's hearing testimony. (T. 19-20). As described above, plaintiff's treatment records show that he appeared to be responding well to treatment, and his most recent therapist questioned his need for additional therapy and encouraged him to pursue employment. (T. 46, 430, 434, 437). At the hearing, plaintiff testified that he was able to shop for groceries, use public transportation, and socialize with his mother and a close friend. (T. 35, 40). The ALJ cited plaintiff's statement to a therapist in 2010 that he "did not like having to work, as it took up much of his day and he preferred other areas of interest, including video games and hunting and fishing, rather than being employed." (T.250). Plaintiff also expressed a lack of interest in working to his

therapist in 2012. (T. 434). The ALJ also considered a letter from plaintiff's close friend, Thomas Puterbaugh, who reported that plaintiff was easily distracted, had a short attention span, and had difficulty with people, but was also able to spend three nights a week with Puterbaugh and his wife on a regular basis, assist with yard work, and go on fishing, hunting and camping trips with him. (T. 20, 242-43). While the record showed that plaintiff had no formal employment since 2009, he had worked three hours a day to offset his housing costs while living at the YMCA. (T. 20, 345).

It is the province of the ALJ to resolve genuine conflicts in the record. *Veino v. Barnhart*, 312 F.3d at 588. However, the Commissioner need not "reconcile explicitly every shred of medical testimony." *Galiotti v. Astrue*, 266 F. App'x 66, 66 (2d Cir. 2008) (citing *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)). Here, the ALJ resolved the conflict between the various medical opinions by assigning the greatest weight to those opinions that she deemed most consistent with plaintiff's overall treatment record and activities. In doing so, the ALJ appropriately evaluated the conflicting medical evidence, and made an RFC finding that was consistent with the overall record.[3] *See Matta v. Astrue*, 508 F. App'x. 53, 56 (2d Cir. 2013) (although ALJ's conclusion did not perfectly correspond with any of the opinions of medical sources, ALJ was entitled to weigh all of the evidence available to make an RFC

---

[3] Plaintiff's contention that the ALJ erred in not discussing plaintiff's low Global Assessment of Functioning ("GAF") test scores in the RFC analysis does not change this recommendation. An ALJ need not explicitly mention a GAF score where he analyzed and gave little weight to the reports that relied on that score. *Truman v. Commissioner of Soc. Sec.*, No. 3:14-CV-1195 (ATB), 2015 WL 5512225, at *14 (N.D.N.Y. Sept. 17, 2015).

finding that was consistent with the record as a whole).

## VIII. <u>VOCATIONAL EXPERT</u>

### A. **Legal Standards**

Once the plaintiff shows that he cannot return to his previous work, the Commissioner bears the burden of establishing that the plaintiff retains the RFC to perform alternative substantial gainful work in the national economy. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). In the ordinary case, the ALJ carries out this fifth step of the sequential disability analysis by applying the applicable Medical-Vocational Guidelines ("the Grids"). *Id.* The Grids divide work into sedentary, light, medium, heavy, and very heavy categories, based on the extent of a claimant's ability to sit, stand, walk, lift, carry, push, and pull. 20 C.F.R. Pt. 404, Subpt. P, App. 2; *Zorilla v. Chater*, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996). *See also* 20 C.F.R. §§ 404.1567 & 416.967. Each exertional category of work has its own Grid, which then takes into account the plaintiff's age, education, and previous work experience. *Id.* Based on these factors, the Grids help the ALJ determine whether plaintiff can engage in any other substantial work that exists in the national economy. *Id.*

"Although the grids are 'generally dispositive, exclusive reliance on [them] is inappropriate' when they do not fully account for the claimant's limitations." *Martin v. Astrue*, 337 F. App'x 87, 90 (2d Cir. 2009) (citation omitted). When significant nonexertional impairments[4] are present or when exertional impairments do not fit

---

[4] A "nonexertional" limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c).

squarely within Grid categories, the testimony of a vocational expert is required to support a finding of residual functional capacity for substantial gainful activity. *McConnell v. Astrue*, 6:03-CV-0521 (TJM), 2008 WL 833968, at *21 (N.D.N.Y. Mar. 27, 2008) (citing, *inter alia*, *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986).

"If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert[,]" rather than relying solely on the Grids. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (*citing Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986)). The mere existence of a nonexertional impairment does not automatically require consultation with a vocational expert, nor does it preclude reliance on the Guidelines. *Bapp v. Bowen*, 802 F.2d at 603. The requirement for a vocational expert is triggered when a nonexertional impairment causes an "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Id*. at 605-06. The appropriateness of applying the Grids and the necessity for expert testimony must be determined on a case-by-base basis. *Id*. at 605.

## B. Application

Plaintiff contends that the range of unskilled work that was available to plaintiff was severely limited by the RFC's restriction that plaintiff should not work in close proximity to others. Therefore, plaintiff argues that the ALJ erred at step five, by relying solely on the Grids, when plaintiff's non-exertional limitations required consultation with a VE. This court disagrees.

The ALJ met her obligation to consider the non-exertional impairments when she determined that the above limitation would have "little or no effect on the occupational base of unskilled work at all exertional levels" and explained the basis for that determination. *Blessing v. Colvin*, No. 3:14-CV-1489 (GTS), 2015 WL 7313401, at *11 (N.D.N.Y. Nov. 19, 2015). The ALJ reached this conclusion after considering plaintiff's limitations in light of the basic mental demands of unskilled work: the ability to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. (T. 21). Those findings are consistent with the ALJ's RFC analysis described above, and the medical opinion evidence to which she assigned the greatest weight. (T. 19, 372, 396). When establishing the limitation on working on close proximity to others, the ALJ considered the record evidence that plaintiff became stressed and anxious when dealing with crowds or people that he did not know (T. 18, 243, 435-36), but also cited examples of plaintiff's ability to interact with others. (T. 18). In particular, the ALJ noted that plaintiff had worked at a scrap yard under supervision (T. 18, 32); used the community room at his residence (T. 18, 186); used public transportation (T. 18, 35); went to the library (T. 18, 49); and shopped for groceries. (T. 18, 35, 184). Because the determination that plaintiff's non-exertional impairments did not significantly erode the occupational base of unskilled labor was supported by substantial evidence, the ALJ was not required to consult with a VE.[5] *See*

---

[5] Plaintiff cites *D'Anna v. Comm. of Soc. Sec.*, No. 08-1650, 2009 WL 5214998 (M.D.Fla Dec. 30, 2009) and *Shankles v. Astrue*, No. 09-1258, 2010 WL 5169077 (E.D.Cal. Dec. 14, 2010) as cases in which the court remanded for the ALJ's failure to call a VE where the claimant

*Sipe v. Astrue*, 873 F. Supp.2d 471, 481 (N.D.N.Y. 2012) (affirming ALJ's decision not to use a VE when plaintiff was *inter alia*, mildly or moderately limited in all the basic mental functions listed on the RFC form); *Ellis v. Comm'r of Soc. Sec.*, No. 3:11-CV-1205 (GTS/ATB), 2012 WL 5464632, at *14 (N.D.N.Y. Sept. 7, 2012) (ALJ was not required to consult a VE when moderate limitation on ability to work in proximity to others without distraction did not significantly diminish ability to perform unskilled work).

　　　　**WHEREFORE**, based on the findings above, it is

　　　　**RECOMMENDED**, that the decision of the Commissioner be affirmed, and the plaintiff's complaint be **DISMISSED**.

　　　　Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated:　　　　February 11, 2016

　　　　　　　　　　　　　　　　　　_Andrew T. Baxter_
　　　　　　　　　　　　　　　　　　**Hon. Andrew T. Baxter**
　　　　　　　　　　　　　　　　　　**U.S. Magistrate Judge**

---

had a limited ability to work in close proximity to others.  Unlike this case, the ALJs in *D'Anna* and *Shankles* failed to determine whether plaintiff could meet the basic mental demands of unskilled work.  *D'Anna*, 2009 WL 5214998, at *6-7; *Shankles*, 2010 WL 5169077, at *14. These cases, offered as persuasive authority, are thus distinguishable from the issues considered herein.